FILED

**LAW OFFICES OF LEO JAMES TERRELL**
Leo James Terrell (SBN 149693)
8383 Wilshire Blvd., Suite 652
Beverly Hills, California 90211
Phone: (323) 655-6909
Fax: (323) 655-5104
civil1975@aol.com

13 FEB 26 PM 3: 03

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES

BY:_____

Attorney for Plaintiffs

Stanley Haveriland, Theodore Thomas,
Horace Pennman, Julia Simmons,
Heather Presha, Sally Stein

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CV13-01410-SVW(PLAx)

| | |
|---|---|
| STANLEY HAVERILAND, THEODORE THOMAS, HORACE PENNMAN, JULIA SIMMONS, HEATHER PRESHA, SALLY STEIN, individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal organization, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR:**<br><br>1.  Violation of the United States Constitution, Fourteenth Amendment (42 U.S.C. § 1983)<br><br>2.  Violation of Section 204 of the Los Angeles City Charter<br><br>3.  Violation of Article II, Section 11(a) of the California Constitution<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs STANLEY HAVERILAND, THEODORE THOMAS, HORACE PENNMAN, JULIA SIMMONS, HEATHER PRESHA, and SALLY STEIN (hereinafter collectively referred to as "Plaintiffs"), bring this Complaint against Defendant CITY OF LOS ANGELES (hereinafter referred to as "CITY" or "Defendant"), and Does 1 through 10, inclusive, and allege, on information and belief, except as to their own actions, as follows:

**NATURE OF THE ACTION**

1.    This action is brought by residents of Los Angeles City Council ("City Council") Districts 8, 9, and 10 to challenge the unlawful and unconstitutional ordinance that the Defendant

1
COMPLAINT

1  CITY recently enacted redrawing the City Council district boundaries (the "Redistricting
2  Ordinance").

3      2.    In particular, by enacting the Redistricting Ordinance, the CITY redrew City
4  Council District ("CD") 10 for the explicit purpose of increasing the percentage of registered
5  African-American voters in CD 10. Indeed, an appointee of the Redistricting Commission that
6  drew the new District boundaries acknowledged at the outset of the redistricting process, both
7  orally and in writing, that his goal in redrawing the boundaries of CD 10 was to "protect the
8  historical African American incumbents in this district [CD 10] **by increasing the black voter**
9  **registration percentage and CVAP[1] #s [citizen voting age population] accordingly.**" The
10  appointee then took actions throughout the redistricting process to achieve that goal. After it had
11  been accomplished, current City Council President and Councilman for CD 10, Herb Wesson Jr.,
12  while speaking to a group of African-American ministers in July 2012, stated that the redrawing
13  of the boundaries of CD 10 during the redistricting process enabled him to "protect the most
14  important asset that we as black people have, and that's to **make sure that a minimum of two of**
15  **the council people will be black for the next 30 years.**"

16      3.    In order to increase the percentage of registered African-American voters in CD
17  10, the CITY removed certain key and historically African-American neighborhoods from
18  neighboring CD 8 – the CITY'S only existing majority African-American CVAP District – and
19  placed them into CD 10. In doing so, the CITY ignored the voices of numerous residents of
20  historically African-American neighborhoods in CD 8, who had asked during the redistricting
21  process for their neighborhoods to be kept intact and in CD 8. The CITY also jettisoned from CD
22  10 substantial portions of the "Palms" neighborhood in the formerly western portion of CD
23  10, in which African-Americans were a minority.

24      4.    Furthermore, the CITY artificially split Koreatown, a clearly defined, compact,
25  and well-recognized community in the Mid-City area of Los Angeles, into two separate City
26  Council Districts ("Districts" or "CDs"), CD 10 and CD 13. Instead of placing the entirety of the

27

28

[1] CVAP refers to Citizen Voting Age Population.

1  Koreatown community into a single District, as residents of that community had requested, the

2  CITY divided it to pursue its strategy of inflating the number of registered African-American

3  voters in CD 10. The CITY refused to incorporate the entirety of Koreatown into CD 10 because

4  doing so would reduce the percentage of registered African-American voters in CD 10.

5      5.      In redrawing CD 10's boundaries explicitly for racial reasons, without any

6  compelling legal justification, the CITY also ignored key traditional redistricting principles. The

7  CITY split communities and neighborhoods instead of keeping them whole; it ignored the almost

8  unanimous requests of the public to keep Koreatown whole in a single District and the numerous

9  requests of CD 8's residents to remain in CD 8; and it substantially underpopulated CD 8, as a

10  result of its decision to split apart and move portions of historically African-American

11  neighborhoods from CD 8 to CD 10.

12      6.      Furthermore, in enacting the Redistricting Ordinance, the CITY redrew CD 9's

13  boundaries predominantly on the basis of race, without any compelling legal justification. In

14  particular, the CITY redrew CD 9 for the explicit purpose of increasing the Latino CVAP in CD 9,

15  thereby creating a fifth Latino CVAP majority-minority District, purportedly to comply with

16  Section 2 of the Voting Rights Act of 1965, but did so without any evidence, analysis, or

17  consideration of racially polarized voting in the CITY, and did so despite an increase in the

18  number of Latinos elected to municipal office between 2001 and 2011.[2] Indeed, an appointee of

19  the Redistricting Commission that drew the new District boundaries, in opposing certain

20  amendments to the proposed western boundary of CD 9 at a February 15, 2012 meeting of the

21  Redistricting Commission, acknowledged orally that the goal in redrawing the boundaries of CD

22  9 was to increase the Latino CVAP in that District and thereby create a fifth Latino CVAP

23  majority-minority District: "Commissioners, I would ask for a no vote. **This is the area of the**

24

25

26  [2] Electoral trends demonstrate that the number of Latinos holding the offices of City Council member, City Attorney, and Mayor increased between 2001 and 2011. In 2001 and 2002, four of these elected officials were Latino; in 2003 and 2004, five of these elected officials were Latino; in 2005, six of these elected officials were Latino; in 2006, five of these elected Officials were Latino; in 2007 and 2008, six of these elected officials were Latino; and from 2009 through 2011, five of these elected officials were Latino.

27

28

1  city where it's possible to create a fifth CVAP district that has – gives Latinos an ability to

2  grow. If you look at how we grew in the last ten years, we grew by about 100,000 people. The

3  Anglo/white population in the city grew 33,000 voters, but the Latino population in the city grew

4  by 119,000. The Asian population of the city grew by 58,000, and the African-American

5  population actually declined by 54,000. **That's what the struggle is in the conflict of CD 9**

6  **and how we're drawing it.** That's the conflict of the change in demographics that are

7  happening in the city, and, those are decisions that we are all working on, you know, whether it's

8  this district, that district, what is it? It's a conflict. **And by moving these lines over west of the**

9  **110, you are diluting Latino population and Latino voter registration, and therefore, taking**

10  **away the opportunity for there to be a fifth Latino councilman on the Council."**

11  Subsequently, during that same meeting, the appointee, in opposition to a proposed change to CD

12  9 that would have restored CD 9's general 2001 configuration and preserved its existing

13  neighborhoods, stated: "You made my point even further. **By adding this into CD 9, you're**

14  **diluting the Latino ability to win a seat. It's a dilution of the Latino vote.** And so, yes,

15  you're absolutely right Ms. Dupont-Walker, **this is an effort to dilute Latino voters in CD 9."**

16      7.      In order to increase the Latino CVAP in CD 9, and thereby create a fifth Latino

17  CVAP majority-minority District, the CITY moved most of the Downtown Los Angeles

18  ("Downtown") community from CD 9 into neighboring CD 14, with the exception of the Los

19  Angeles Convention Center, Staples Center, and L.A. Live landmarks and adjacent properties,

20  which were artificially split from the Downtown community. In doing so, the CITY ignored the

21  voices of residents from numerous neighborhoods and communities and other stakeholders in CD

22  9 who had asked during the redistricting process for the 2001 boundaries of CD 9 to be kept

23  intact to the extent feasible, and requested to remain in CD 9.

24      8.      In redrawing CD 9's boundaries predominantly for racial reasons, without any

25  compelling legal justification, the CITY also ignored key traditional redistricting principles. As a

26  result of its decision to move most of the Downtown community from CD 9 to CD 14, the CITY

27  split communities and neighborhoods instead of keeping them whole, and ignored requests made by

28  numerous residents and stakeholders of CD 9 to keep the 2001 boundaries of CD 9 intact and

1  to remain in CD 9.

2        9.      The CITY has diluted and negatively impacted the voting power of African-

3  American residents in CD 8 by unnecessarily, unlawfully, and unconstitutionally removing

4  certain key and historically African-American neighborhoods from CD 8, and placing them into

5  neighboring CD 10 for the explicit purpose of protecting historical African-American incumbents

6  in CD 10 by increasing the number of registered African-American voters in CD 10.

7  Additionally, in redrawing the boundaries of CD 9 for predominantly racial reasons, the CITY

8  created a fifth Latino CVAP majority-minority District without any evidence, analysis, or

9  consideration of racially polarized voting in the CITY, and did so despite an increase in the

10  number of Latinos elected to municipal office between 2001 and 2011. The Redistricting

11  Ordinance therefore violates both the United States Constitution, and those portions of the Los

12  Angeles City Charter mandating that the CITY, if feasible, keep neighborhoods and communities

13  intact. Plaintiffs therefore ask this Court (a) to declare the Redistricting Ordinance unlawful and

14  unconstitutional, and (b) appoint a Special Master to redraw the Districts so that they comply

15  with all applicable laws and constitutional provisions.

16                              **JURISDICTION AND VENUE**

17        10.     Jurisdiction is vested in this court under 28 U.S.C. sections 1331, 1343(a)(3) and

18  1343(a)(4), 1367(a), and 2201, as well as 42 U.S.C. sections 1973, 1981, and 1983.

19        11.     Venue is proper in the Central District of California under 28 U.S.C. sections

20  1391(a) and 1391(b).

21                                      **PARTIES**

22        12.     Plaintiff STANLEY HAVERILAND is, and at all relevant times herein was, a

23  registered voter and resident of the Baldwin Hills/Crenshaw neighborhood in the City and

24  County of Los Angeles, and a citizen of the State of California. Pursuant to the Redistricting

25  Ordinance, Plaintiff STANLEY HAVERILAND resides in CD 8.

26        13.     Plaintiff THEODORE THOMAS is, and at all relevant times herein was, a

27  registered voter and resident of the Hyde Park neighborhood in the City and County of Los

28  Angeles, and a citizen of the State of California. Pursuant to the Redistricting Ordinance,

1    Plaintiff THEODORE THOMAS resides in CD 8.

2        14.    Plaintiff HORACE PENNMAN is, and at all relevant times herein was, a

3    registered voter and resident of the Florence neighborhood in the City and County of Los

4    Angeles, and a citizen of the State of California. Pursuant to the Redistricting Ordinance,

5    Plaintiff HORACE PENNMAN resides in CD 9.

6        15.    Plaintiff JULIA SIMMONS is, and at all relevant times herein was, a registered

7    voter and resident of the Gramercy Park neighborhood in the City and County of Los Angeles,

8    and a citizen of the State of California. Pursuant to the Redistricting Ordinance, Plaintiff JULIA

9    SIMMONS resides in CD 8.

10       16.    Plaintiff HEATHER PRESHA is, and at all relevant times herein was, a registered

11   voter and resident of the Leimert Park neighborhood in the City and County of Los Angeles, and a

12   citizen of the State of California.  Pursuant to the Redistricting Ordinance, Plaintiff Presha, now,

13   resides in CD 10.

14       17.    Plaintiff SALLY STEIN is, and at all relevant times herein was a registered voter and

15   resident of the Korea Town neighborhood in the City and County of Los Angeles, and a citizen of

16   the State California.  Pursuant to the Redistricting Ordinance, Plaintiff Stein resides in CD 10.

17       18.    Defendant CITY is, and at all relevant times herein was, a municipal corporation

18   or political subdivision of the United States, organized and existing under the laws of the State of

19   California.

20                        **FACTUAL ALLEGATIONS**

21                **An Overview of the Redistricting Process**

22       19.    Section 241 of the Los Angeles City Charter ("City Charter") provides for the

23   CITY to be divided into 15 Districts. Each District elects a single member of the City Council.

24       20.    The City Charter requires that the District boundaries be redrawn every ten years.

25       21.    Before 1999, the City Charter provided that the City Council would draft the new

26   District maps.

27       22.    In 1999, following two years of intensive work and substantial public input, two

28   Los Angeles charter reform commissions (collectively, the "Commission") made a joint

1  recommendation to substantially amend the City Charter. On June 8, 1999, Los Angeles voters

2  approved the Commission's recommendations. The amendments adopted by the residents of Los

3  Angeles included a complete overhaul of the process by which District boundaries were to be

4  redrawn.

5      23.    In particular, Section 204 of the amended City Charter provided for the creation of

6  a Redistricting Commission to create, in the first instance, the new District boundaries. The City

7  Charter provided that each City Council member would appoint one commission member to the

8  Redistricting Commission, with the exception that the Council President would appoint two

9  members; the Mayor of Los Angeles would appoint three members; and the City Attorney and

10  Controller of Los Angeles each would appoint one member.

11      24.    The Redistricting Commission was required to present its proposed map to the

12  City Council, which was required to finally approve a redistricting ordinance providing for new

13  District boundaries by July 1, 2002 (and every tenth anniversary thereafter).

14      25.    The amended City Charter also specified the criteria by which the Redistricting

15  Commission would determine the new District boundaries. In particular, the City Charter

16  provided that "All districts shall be drawn in conformance with **requirements of state and**

17  **federal law and, to the extent feasible, shall keep neighborhoods and communities intact,**

18  **utilize natural boundaries or street lines, and be geographically compact.**"

19      26.    The amended City Charter also provided that the Redistricting Commission "**shall**

20  **seek public input throughout the redistricting process.**"

21      **The Appointment of the Current Redistricting Commission and Instructions by the City**

22      **Attorney to Respect Communities of Interest**

23      27.    In August 2011, following the 2010 census, the members of the City Council, the

24  Mayor, the Controller, and the City Attorney of Los Angeles named their respective appointees to

25  the 21-member Redistricting Commission. (The members of the Redistricting Commission are

26  referred to herein as "Commissioners.") By September 2011, the membership of the

27  Redistricting Commission was set.

28

COMPLAINT

1   28.   On September 27, 2011, the Redistricting Commission held its first meeting. At

2   that meeting, Deputy City Attorney Harit U. Trivedi provided the Redistricting Commission with

3   a "Summary of Redistricting Law and Criteria." Among other things, the Summary stated that:

4   (a) Any new District maps would need to comply with both state and federal law;

5   (b) The City Charter **required** that Districts keep neighborhoods and communities

6   intact to the extent feasible;

7   (c) The Redistricting Commission needed to respect "communities of interest,"

8   defined in reference to cultural and language characteristics, employment and

9   economic patterns, health and environmental conditions, and other common

10   issues; and

11   (d) The Redistricting Commission could not engage in "racial gerrymandering,"

12   meaning race "must not" be the predominant factor in drawing the new District

13   maps and that traditional criteria "must not" be subordinated to consideration of race.

14   29.   Between September 27, 2011 and December 5, 2011, the Redistricting Commission

15   proceeded to hire executive and other staff. In particular, the Redistricting Commission voted to

16   hire as Executive Director Andrew Westall, a former senior deputy for City Council President

17   Herb Wesson Jr., the City Councilman for CD 10. Andrew Westall then proceeded to hire

18   certain additional staff, including public relations workers, to assist the Redistricting

19   Commission.

20   ## Public Input

21   30.   Between December 5, 2011 and January 12, 2012, and between February 1 and

22   February 11, 2012, the Redistricting Commission held a series of public hearings, at which the

23   public was invited to comment on the redistricting process. However, none of the actual

24   linedrawing took place in public. Instead, the Redistricting Commission passively received the

25   public's comments at these hearings.

26   31.   Nonetheless, the Redistricting Commission heard from hundreds of residents

27   concerning their neighborhoods. In particular, numerous residents of historically and

28   predominantly African-American neighborhoods in CD 8, including residents of Leimert Park

1    and Baldwin Hills, testified at these hearings. The vast majority of these residents testified that

2    they wanted their communities to remain undivided in CD 8.

3        32.    At these public hearings, numerous residents of neighborhoods and communities

4    in CD 9 asked that the 2001 boundaries of CD 9 remain the same. The Redistricting

5    Commission also heard from hundreds of stakeholders from CD 9, including stakeholders from

6    Little Tokyo, Skid Row, and senior executives from numerous major Downtown Los Angeles

7    landmark institutions such as the Music Center, the Museum of Contemporary Art, and the

8    Cathedral of Our Lady of Angels. The vast majority of these stakeholders uniformly

9    communicated their desire that the 2001 boundaries of CD 9 be kept intact to the extent feasible,

10   and requested to remain in CD 9.

11       33.    Additionally, hundreds of residents and other interest-holders of Koreatown

12   attended the public hearings; these residents publicly, and almost unanimously, requested that

13   Koreatown be placed whole into a single District.

14       34.    As explained below, in redrawing CD 10 to move certain key and historically African-

15   American neighborhoods from neighboring CD 8 into CD 10 and to split Koreatown, the

16   CITY ignored the stated desires of residents of African-American neighborhoods in CD 8 and

17   residents of Koreatown. Moreover, in redrawing CD 9 to create a fifth Latino CVAP majority-

18   minority District, the CITY ignored the stated desires of residents and stakeholders from CD 9.

19   **The Redistricting Commission Divides into "Ad Hoc" Sub-Committees Dispute Resolution**

20   **Committees that Draw Maps Entirely Out of the Public Eye**

21       35.    As noted above, the City Charter specifically requires that the Redistricting

22   Commission seek public input "throughout" the line-drawing process. Nonetheless, the

23   Redistricting Commission chose to draw the lines for each of the new Districts entirely in private.

24       36.    Specifically, at a January 11, 2012 meeting of the Redistricting Commission, the

25   Chair of the Redistricting Commission, Arturo Vargas, a Mayor-appointee, proposed that the

26   Redistricting Commission divide into three "Ad Hoc Regional Line Drawing Committees" (the

27   "Ad Hoc Committees") to correspond to one of three "regions": (1) San Fernando Valley; (2)

28   West and Southwest Los Angeles; and (3) East and Southeast Los Angeles. Each of the three Ad

1    Hoc Committees would be comprised of seven Commissioners. Each Ad Hoc Committee would

2    meet on its own and be responsible for drawing an initial map of the Districts in its respective

3    region. Each Ad Hoc Committee's discussions would be "limited to staff and their own team

4    members." As noted in Chairman Vargas's report for the January 11, 2012 meeting, this was

5    done to "avoid any Brown Act issues [*i.e.*, the requirement of the Brown Act that legislative

6    decisions be made in public]."

7         37.    The proposal to divide the members of the Redistricting Commission into three

8    Ad Hoc Committees additionally provided for the creation of two Dispute Resolution

9    Committees, which would be responsible for reconciling and consolidating the various draft

10   maps drawn by the Ad Hoc Committees: (1) the Valley/West Resolution Committee, and (2) the

11   East/West Resolution Committee. Each Dispute Resolution Committee would be comprised of

12   ten members of the Redistricting Commission. Each Dispute Resolution Committee would meet

13   on its own and be responsible for reconciling and consolidating the draft maps drawn by the Ad

14   Hoc Committees. The Dispute Resolution Committees would not be permitted to confer with

15   one another during this process. Upon information and belief, the Dispute Resolution

16   Committees were structured in this manner in order to avoid triggering the Brown Act and thereby

17   prevent public input during the initial line-drawing process.

18        38.    The Redistricting Commission voted, over the objections of a minority of the

19   Commissioners, to approve this proposal.

20        39.    Yet, upon information and belief, the members of the three Ad Hoc Committees

21   did meet with each other to coordinate their efforts to draw the various District boundaries,

22   thereby doing exactly what they claimed to be avoiding – decision-making out of the public eye.

23        40.    Upon information and belief, before the first meetings of the Ad Hoc Committees,

24   certain members of the City Council and certain members of the Ad Hoc Committees had

25   communicated with each other regarding how they wanted their respective Districts to be drawn.

26   As a result, upon information and belief, the new boundaries of the various Districts had been

27   decided in secret before the Ad Hoc Committees met.

28

1    41.    Upon information and belief, City Council President Herb Wesson Jr., together

2    with Commissioner Christopher Ellison and others, agreed before the Ad Hoc Committee

3    meetings began to increase the percentage of African-American registered voters in CD 10 to

4    close to or above 50%.

5    42.    Upon information and belief, prior to the commencement of the Ad Hoc

6    Committee meetings, City Council President Wesson, Commissioner Ellison, and other City

7    Council members and Redistricting Commissioners agreed upon the precise boundaries of CD 10

8    to achieve the goal of increasing the percentage of African-American registered voters in CD 10.

9    Upon information and belief, these members of the City Council and Redistricting Commission

10    decided those boundaries with the aid of digital data collected and/or maintained by the CITY

11    concerning the block-by-block racial composition of the neighborhoods in and surrounding CD

12    10.

13    43.    Upon information and belief, the meetings held by each of the three Ad Hoc

14    Committees were serial in nature. The San Fernando Valley Ad Hoc Committee met first. The

15    West and Southwest Los Angeles and East and Southeast Los Angeles Ad Hoc Committees met

16    subsequently. At these meetings, each of the Ad Hoc Committees, with the exception of the San

17    Fernando Valley Ad Hoc Committee, was bound by the decisions reached in the previous Ad

18    Hoc Committee meetings.

19    44.    Upon information and belief, the meetings held by each of the two Dispute Resolution

20    Committees were serial in nature. The Valley/West Resolution Committee was the

21    first to meet and consolidate the various draft maps of certain Districts prepared by the Ad Hoc

22    Committees. The East/West Resolution Committee met subsequently, and was bound by the

23    decisions made in the meetings of the Valley/West Resolution Committee.

24    45.    By adopting the proposal to divide the members of the Redistricting Commission

25    into the Ad Hoc Committees and Dispute Resolution Committees, the Redistricting Commission

26    affirmatively prevented public input during the drafting process for the Redistricting

27    Commission's initial draft map. As a result, during the period between January 11 and January

28    25, 2012, when each Ad Hoc Committee and Dispute Resolution Committee was drawing the

draft maps for their respective Districts, decisions were made behind closed doors and without public input, in apparent contravention of Section 204(c) of the City Charter and the requirements of the Ralph M. Brown Act.

**The West and Southwest Ad Hoc Committee Explicitly Redraws the Boundaries for CD 10 on the Basis of Race, Moving Key and Historically African-American Neighborhoods from CD 8 into CD 10 and Splitting Koreatown into Two Districts**

46.    The Ad Hoc Committee responsible for the "West and Southwest Los Angeles" region (the "West/South Ad Hoc Committee") first met on Friday, January 20, 2012. The West/South Ad Hoc Committee was responsible for redrawing five Districts: CD 4, CD 5, CD 8, CD 10, and CD 11.

47.    At the January 20 meeting, Commissioner Ellison, who had been appointed to the Redistricting Commission by City Council President Herb Wesson Jr. (the City Councilman from CD 10), announced his intention to increase the level of African-American registered voters in CD 10 to over 50% from its 2001 level of 43.2%.

48.    After announcing that his specific (and only stated) goal was to increase the number of African-American registered voters in CD 10, Commissioner Ellison asked the Commission's Technical Director to show on a screen the current CD 10 boundaries overlaid with the African-American demographics for the surrounding neighborhoods.

49.    Using the overlay, Commissioner Ellison proceeded to add to CD 10 numerous neighborhoods adjacent to the former CD 10 boundaries with a majority African-American population, until African-American registered voters represented over 50% of CD 10's voters (the "Ellison Map").

50.    Commissioner Ellison did so by removing certain landmark African-American neighborhoods from CD 8, including Leimert Park, the "Dons" portion of Baldwin Hills, and other established African-American neighborhoods and communities, and moving them to CD 10.

51.    At the same time, Commissioner Ellison removed from CD 10 various neighborhoods in which African-Americans were a minority. In particular, Commissioner Ellison removed a substantial portion of the "Palms" neighborhood, a densely populated

1  neighborhood in which the Caucasian, Latino, and Asian populations each outnumber the

2  African-American population, from the western portion of CD 10.

3      52.    In that same line-drawing exercise, Commissioner Ellison excluded from CD 10

4  all of Koreatown north of Third Street or east of Vermont. The remaining portion of Koreatown

5  was placed into CD 13.

6      53.    Upon information and belief, Commissioner Ellison moved certain African-

7  American neighborhoods from CD 8 into CD 10, and removed a substantial part of the "Palms"

8  neighborhood from CD 10, because Commissioner Ellison, City Council President Herb Wesson

9  Jr. (the City Councilman for CD 10), and/or other members of the City Council and the

10  Redistricting Commission wanted to increase the percentage of registered African-American

11  voters in CD 10.

12      54.    Upon information and belief, Commissioner Ellison excluded the remaining

13  portion of Koreatown from CD 10, making Asian-Americans a captive minority of CD 10 in the

14  process, because Commissioner Ellison, City Council President Herb Wesson Jr. (the City

15  Councilman for CD 10), and/or other members of the City Council and the Redistricting

16  Commission did not want to reduce the percentage of African-American registered voters in CD

17  10.

18      55.    Also on January 20, 2012, immediately following the meeting of the West/South

19  Ad Hoc Committee, Commissioner Ellison wrote an email to the other members of the

20  West/South Ad Hoc Committee explaining his rationale in drawing CD 10: Being a historical

21  African American opportunity district, we found it necessary to increase the AA population. **We**

22  **attempted to protect the historical African American incumbents in this district by increasing**

23  **the black voter registration and CVAP #s accordingly.** As you can discern on the attachment, we

24  were able to increase the numbers to 50.12% and 42.8% respectively. This was a significant

25  increase in black voters in CD 10 which would protect and assist in keeping CD 10 a predominantly

26  African-American opportunity district.

27      56.    The following day, January 21, 2012, Commissioner Helen Kim, an appointee of

28  Controller Wendy Greuel, proposed an alternative map of CD 10 that would have kept intact the

1  entirety of Koreatown, as defined by the Wilshire Center-Koreatown Neighborhood Council

2  boundaries ("WCKNC Boundaries").

3      57.    The West/South Ad Hoc Committee voted on both the Ellison Map and the

4  alternative map presented by Commissioner Kim. Both maps received three (3) votes in favor

5  (out of seven (7) total votes). As a result, because both maps received the same number of votes,

6  the West/South Ad Hoc Committee agreed to submit both maps to the Dispute Resolution

7  Committee tasked with resolving disputes between proponents of conflicting maps.

8      58. But the Ellison Map was the only map of CD 10 considered by the Dispute

9  Resolution Committee, and therefore was the only map of CD 10 provided to the full

10  Redistricting Commission. The Ellison Map was also the only map of CD 10 that was presented

11  to the public for comment. Upon information and belief, Commissioner Ellison and other

12  proponents of the Ellison Map intentionally suppressed the alternative map presented by

13  Commissioner Kim.

14      59.    In July 2012, following the City Council's adoption of the Redistricting

15  Commission's Final Map Recommendation, as amended following the issuance of a report

16  authored by the CITY'S Chief Legislative Analyst, current City Council President and

17  Councilman for CD 10 Herb Wesson Jr., while speaking to a group of African-American

18  ministers, stated that the redrawing of the boundaries of CD 10 during the redistricting process

19  enabled him to "protect the most important asset that we as black people have, and that's to

20  **make sure that a minimum of two of the council people will be black for the next 30 years."**

21

22      **The Redistricting Commission Explicitly Redraws the Boundaries for CD 9 on the Basis of**

23      **Race, Creating a Fifth Latino CVAP Majority-Minority District Without Any Evidence,**

24      **Analysis, or Consideration of Racially Polarized Voting in the City of Los Angeles, and**

25      **Ignores Public Input from Residents and Stakeholders of CD 9 in the Process.**

26

27      60.    Upon information and belief, in enacting the Redistricting Ordinance, the CITY

28  redrew CD 9 predominantly on the basis of race, without any compelling legal justification. In

COMPLAINT

1  particular, the CITY redrew the boundaries of CD 9 for the explicit purpose of increasing the

2  Latino CVAP in CD 9, thereby creating a fifth Latino CVAP majority-minority District,

3  purportedly to comply with Section 2 of the Voting Rights Act of 1965, but did so without any

4  evidence, analysis, or consideration of racially polarized voting in the CITY, and did so despite

5  an increase in the number of Latinos elected to municipal office between 2001 and 2011. Indeed,

6  an appointee of the Redistricting Commission that drew the new District boundaries, in opposing

7  certain amendments to the proposed western boundary of CD 9 at a February 15, 2012 meeting of

8  the Redistricting Commission, acknowledged orally that the goal in redrawing the boundaries of

9  CD 9 was to increase the Latino CVAP in that district and thereby create a fifth Latino CVAP

10  majority-minority District: "Commissioners, I would ask for a no vote. **This is the area of the**

11  **city where it's possible to create a fifth CVAP district that has – gives Latinos an ability to**

12  **grow.** If you look at how we grew in the last ten years, we grew by about 100,000 people. The

13  Anglo/white population in the city grew 33,000 voters, but the Latino population in the city grew

14  by 119,000. The Asian population of the city grew by 58,000, and the African-American

15  population actually declined by 54,000. **That's what the struggle is in the conflict of CD 9**

16  **and how we're drawing it.** That's the conflict of the change in demographics that are

17  happening in the city, and, those are decisions that we are all working on, you know, whether it's

18  this district, that district, what is it? It's a conflict. **And by moving these lines over west of the**

19  **110, you are diluting Latino population and Latino voter registration, and therefore, taking**

20  **away the opportunity for there to be a fifth Latino councilman on the Council."**

21  Subsequently, during that same meeting, the appointee, in opposition to a proposed change to CD

22  9 that would have restored CD 9's general 2001 configuration and preserved its existing

23  neighborhoods, stated: "You made my point even further. **By adding this into CD 9, you're**

24  **diluting the Latino ability to win a seat. It's a dilution of the Latino vote. And so, yes,**

25  **you're absolutely right Ms. Dupont-Walker, this is an effort to dilute Latino voters in CD 9."**

26      61.     In order to increase the Latino CVAP in CD 9 and thereby create a fifth Latino CVAP

27  majority-minority District, the CITY removed most of the Downtown community from CD 9 and

28  added it into neighboring CD 14, with the exception of the Los Angeles Convention Center, Staples

1   Center, and L.A. Live landmarks and adjacent properties, which were artificially split from the

2   Downtown community. In doing so, the CITY ignored the voices of residents from numerous

3   neighborhoods and communities and other stakeholders in CD 9 who had asked during the

4   redistricting process for the 2001 boundaries of CD 9 to be kept intact to the extent feasible, and

5   requested to remain in CD 9.

6       62.     In redrawing CD 9's boundaries predominantly for racial reasons, without any

7   compelling legal justification, the CITY also ignored key traditional redistricting principles. As a

8   result of its decision to move most of the Downtown community from CD 9 to CD 14, the CITY

9   split communities and neighborhoods instead of keeping them whole, and ignored requests made

10  by numerous residents and stakeholders of CD 9 to keep the 2001 boundaries of CD 9 intact and

11  to remain in CD 9.

12      **The Redistricting Commission Ignores Numerous Alternative Plans That Would Have**

13      **Respected the Wishes of Residents in CDs 8 and 9 and the Koreatown Community**

14      63.     Following the completion of the work of the Ad Hoc Committees and the Dispute

15  Resolution Committees, the combined maps of the three Ad Hoc Committees were presented to

16  the public (the "Initial Commission Map"). Between February 1 and February 11, 2012, the

17  Redistricting Commission held its second series of public hearings at which Los Angeles

18  residents were given an opportunity to comment on the proposed maps. As was the case in the

19  first series of public hearings, the Redistricting Commission did not engage in line-drawing at the

20  public hearings.

21      64.     During and before the February public hearings, various constituents submitted

22  alternative maps to the Redistricting Commission that would have respected the wishes of

23  residents and stakeholders of CD 8 and CD 9. With respect to CD 9, these alternatives included

24  a Proposed Citywide Map, submitted by Neighborhood Councils Intact ("NCI") to the

25  Redistricting Commission on January 13, 2012, and a proposed Map for Council Districts 8, 9,

26  10, and 15, submitted by the South LA Redistricting Collaborative ("Redistricting

27  Collaborative") to the Redistricting Commission on January 19, 2012, each of which kept the

28  Downtown Los Angeles Neighborhood Council ("DLANC") whole in CD 9. With respect to CD 8,

1    these alternatives included:

2        a.      A Proposed Map for Council District 10 or Council District 8, submitted by United

3                   Community Associations ("UCA") to the Redistricting Commission on January 18,

4                   2012, which kept the Empowerment Congress West Area Neighborhood Development

5                   Council ("ECWANDC") and the Baldwin Hills/Crenshaw and Leimert Park

6                   Communities whole in either CD 8 or CD 10;

7

8        b.      A Proposed Citywide Map, submitted by Dr. Daniel Wiseman to the Redistricting

9                   Commission on February 13, 2012, which kept the ECWANDC and the Baldwin

10                  Hills/Crenshaw and Leimert Park Communities whole in CD 8.

11       65.      Furthermore, during and before the February hearings, various constituents

12   submitted to the Redistricting Commission alternative maps to the Initial Commission Map

13   which would have kept the Koreatown community, as defined by the WCKNC Boundaries,

14   whole in a single District. These included a Proposed Los Angeles Citywide Plan, submitted by

15   the Asian Pacific American Legal Center ("APALC") to the Redistricting Commission on

16   January 18, 2012, which kept the WCKNC Boundaries whole in CD 13. In addition, Grace Yoo,

17   executive director of the Korean American Coalition ("KAC"), presented a map at a public

18   hearing on February 9, 2012, which kept the WCKNC Boundaries whole in CD 13.

19       66.      Unlike the map reflecting the CD boundaries drawn by Commissioner Ellison,

20   none of the maps submitted by NCI, the Redistricting Collaborative, UCA, APALC, KAC, or Dr.

21   Wiseman were ever presented or voted on at any meeting of the Redistricting Commission.

22       67.      At a meeting of the Redistricting Commission on January 25, 2012,

23   Commissioner Helen Kim presented a proposed map (the "Kim Map") that would have placed

24   the entirety of the WCKNC Boundaries whole in CD 13. The Redistricting Commission rejected

25   this map, and instead extended a portion of the northern boundary of Koreatown just a few streets

26   northward to Beverly Boulevard. This resulted in the exclusion of 30% of the population of

27   Koreatown from CD 10.

28

**In Approving the Final Commission Map, the City and the Redistricting Commission Ignore the Voices of Residents of CDs 8 and 9 and the Unanimous Voices of the Koreatown Community, as Well as Traditional Redistricting Criteria**

68.     Hundreds of residents and other stakeholders from CD 8 asked that the 2001 boundaries of CD 8 be kept intact during the public hearings held by the Redistricting Commission. Numerous residents of historically and predominantly African-American neighborhoods in CD 8, including residents of Leimert Park and Baldwin Hills, testified at these hearings. The vast majority of these residents testified that they wanted their communities to remain undivided in CD 8. In particular, the majority of the public input received at the Redistricting Commission's February 11, 2012 regional public hearing supported retention of the current boundaries of CD 8.

69.     During the public hearings held by the Redistricting Commission, numerous residents of neighborhoods and communities in CD 9 asked that the 2001 boundaries of CD 9 remain the same. The Redistricting Commission also heard from hundreds of stakeholders from CD 9, including stakeholders from Little Tokyo, Skid Row, and senior executives from numerous major Downtown Los Angeles landmark institutions such as the Music Center, the Museum of Contemporary Art, and the Cathedral of Our Lady of Angels. The vast majority of these stakeholders uniformly communicated their desire that the 2001 boundaries of CD 9 be kept intact to the extent feasible, and requested to remain in CD 9.

70.     Additionally, during the public hearings held by the Redistricting Commission, hundreds of Koreatown residents spoke in favor of keeping Koreatown, as defined by the WCKNC Boundaries, whole in a single District. The Redistricting Commission's hearings drew an unprecedented turnout from the Korean-American community; over 99% of the speakers asked for Koreatown to be kept whole in a single District. Furthermore, thousands of Korean Americans testified or submitted letters and 3, 056 petitions were submitted to the Redistricting Commission asking that the WCKNC boundaries be kept whole in CD 13.

71.     In approving the Final Commission Map at a February 22, 2012 meeting, the Redistricting Commission ignored the voices of the residents of historically and predominantly

1    African-American neighborhoods in CD 8, including residents of Leimert Park and Baldwin

2    Hills, who testified at the pre-map and post-map public hearings that they wanted their

3    communities to remain undivided in CD 8.

4        72.    The Redistricting Commission also ignored the requests of numerous residents

5    and stakeholders of CD 9, including stakeholders from Little Tokyo, Skid Row, and senior

6    executives from numerous major Downtown Los Angeles landmark institutions such as the Music

7    Center, the Museum of Contemporary Art, and the Cathedral of Our Lady of Angels, the

8    vast majority of whom uniformly communicated their desire that the 2001 boundaries of CD 9 be

9    kept intact to the extent feasible, and requested to remain in CD 9.

10        73.    The Redistricting Commission also ignored the almost unanimous requests from

11    Koreatown residents – as well as residents of Los Angeles outside Koreatown – to keep the

12    WCKNC Boundaries whole in a single District, and did not consider the public input on this

13    issue in its subsequent meetings.

14        74.    In approving the Final Commission Map, the Redistricting Commission also

15    ignored numerous traditional redistricting criteria in drawing CD 10. The Redistricting

16    Commission exempted CD 10 from its own stated desire to keep neighborhoods and

17    communities intact. It created a District that was not contiguous and compact; more than one

18    media commentator referred to CD 10's appearance as that of a "fat turkey." And it severely

19    underpopulated CD 8; in a single swoop CD 8 went from one of the most populous Districts in

20    Los Angeles to one of the least populous Districts. Under the Final Commission Map, CD 8's

21    total population decreased to 246,597 from 256,660 (a loss of 10,063 persons), resulting in CD 8

22    having the lowest negative deviation (-2.5%) from the ideal population of 252,841 allowable

23    under the redistricting policies adopted by the Redistricting Commission on February 15, 2012.[3]

24    In underpopulating CD 8, the Redistricting Commission displaced 13,849 African-American

25    residents of CD 8 to a different District; 10,611 of these displaced residents were registered

26    voters. Meanwhile, under the Final Commission Map, CD 10 increased its total population from

27    _____

28    [3] According to statistics released after the City Council's adoption of the new Districts,
CD 8 has a total population of 249, 691 and a -2.4% deviation from the ideal population
252, 841.

1  240,450 to 249,305 persons, and gained 10,653 new African-American residents, 8,719 of whom

2  were registered voters, resulting in CD 10 having an African-American CVAP of 43.1 %, and a

3  registered voter population consisting of 50.6% registered African-American voters[4].

4      75.    The Redistricting Commission also ignored traditional redistricting criteria in

5  drawing CD 9. In artificially splitting the Los Angeles Convention Center, Staples Center, and L.A.

6  Live landmarks and adjacent properties from the rest of the Downtown community, the

7  Redistricting Commission exempted CD 9 from its own stated desire to keep neighborhoods and

8  communities intact. Moreover, in ignoring the public input from numerous residents and

9  stakeholders of CD 9, the Redistricting Commission failed to respect the wishes of and preserve

10  communities sharing common interests.

11      76.    In drawing CD 10's boundaries to increase the percentage of African-American

12  voters in CD 10, and in drawing CD 9's boundaries to create a fifth Latino CVAP majorityminority

13  District, the CITY contradicted CD 9's and CD 10's own histories as cross-racial

14  coalition districts. In particular, CD 10 has a special record of producing candidates that have

15  bridged political alliances among a variety of communities. For example, Los Angeles' first

16  African-American mayor, Tom Bradley, represented CD 10 before seeking citywide office, due

17  largely to his ability to forge relationships across racial lines. Much of the election history in CD

18  10 is due to the fact that this District has maintained a balance among the various ethnic and

19  racial populations that live in these neighborhoods. Over the last four decades, no single racial

20  group has controlled more than 40% of the voting age population. Consequently, a winning

21  political candidate typically runs by appealing for votes in more than a single racial community.

22      77.    On February 22, 2012, the Redistricting Commission approved the Final

23  Commission Map and forwarded that map to the City Council for approval.

24      78.    According to statistics released by the Redistricting Commission, the Final

25  Commission Map increased the African-American percentage of the Citizen Voting Age

26  Population ("CVAP") in CD 10 from 36.8% to 43.1%, and increased the percentage of African-

27  

28  [4] According to statistics released after the City Council's adoption of the new Districts, CD 10 has a total population of 256, 962.  African-Americans make up 40.5% of the CVAP, and 48% of the registered voter population.

1  American registered voters in CD 10 from 43.2% to 50.6%. The Final Commission Map made

2  the Korean-American community in CD 10 a captive minority, with an Asian voter registration

3  of 9.2%.[5]

4      79.    Furthermore, under the statistics released by the Redistricting Commission, the

5  Final Commission Map increased the Latino percentage of the CVAP in CD 9 from 48.4% to

6  50.5%, and increased the percentage of Latino registered voters in CD 9 from 43.9% to 45.2%.

7  **Approval by the City Council**

8      80.    On March 14, 2012, Gerry F. Miller, the CITY's Chief Legislative Analyst, issued

9  a report recommending certain revisions to the Final Commission Map. With respect to CDs 8,

10  9, and 10, those changes were largely inconsequential. The CITY approved and ratified the

11  Redistricting Commission's decision to split Koreatown, to move most of the Palms

12  neighborhood out of CD 10, and to move several historic and majority African-American

13  neighborhoods in Baldwin Hills and Leimart Park out of CD 8 and into CD 10. The CITY

14  further approved and ratified the Redistricting Commission's decision to move most of the

15  Downtown community out of CD 9 and into CD 14.

16      81.    On March 16, 2012, the City Council adopted the Final Commission Map, as

17  amended, by a vote of 13-2, and instructed the City Engineer to translate the pictorial map into a

18  word version, called the "metes and bounds," that would constitute the Redistricting Ordinance

19  to be finally passed by the City Council.

20      82.    However, the City Council did not vote on the final Redistricting Ordinance until

21  June 13, 2012, almost three months later. Upon information and belief, the City Council

22  intentionally delayed the development of the metes and bounds and the vote on the Redistricting

23  Ordinance in order to reduce the likelihood that Plaintiffs, and other parties aggrieved by the

24  constitutional and statutory violations resulting from the Redistricting Ordinance, would be able

25  to obtain timely judicial relief before the next City Council elections.

26

27  [5] According to statistics released after the City Council's adoption of the new Districts, in

28  CD 10, African-American CVAP increased to 40.5%, and the percentage of registered African-American voters increased to 48%. Asian voter registration in CD 10 decreased to 9.4%.

21

83.     The City Council's initial vote on the Redistricting Ordinance was not unanimous. As a result, the City Council was required to hold an additional vote on the Redistricting Ordinance one week later. On June 20, 2012, the City Council voted 13-2 to adopt the Redistricting Ordinance.

84.     The Redistricting Ordinance was subsequently signed by Mayor Villaraigosa on June 22, 2012 and published on July 2, 2012.

## FOR THE FIRST CAUSE OF ACTION

### (Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983))

85.     Paragraphs 1 through 84, inclusive, of this Complaint are re-averred and incorporated herein by reference.

86.     Plaintiffs are entitled to the equal protection of the law under the Fourteenth Amendment to the United States Constitution.

87.     The Redistricting Ordinance discriminates on the basis of race against Plaintiffs and all other voters who own businesses or reside in CD 8 or CD 9, in one or more of the ways set forth below, each of which is sufficient to demonstrate race-based discrimination used to include or exclude voters from CD 9 and CD 10:

a.     Defendant CITY redrew district lines predominantly based on racial data, for the illegitimate purpose of packing African-American voters into CD 10 to achieve an artificially high percentage of African-American registered voters in CD 10;

b.     Defendant CITY redrew district lines predominantly based on racial data, for the illegitimate purpose of creating a fifth Latino CVAP majority-minority District, without any evidence, analysis, or consideration of racially polarized voting in Los Angeles, and despite an increase in the number of Latinos elected to municipal office between 2001 and 2011;

c.   Defendant CITY'S use of race as the predominant line-drawing criterion subordinated traditional redistricting principles and conflicts with documented population shifts in the relevant area of Los Angeles, as evidenced by (among other things) the data from the 2010 Census;

d.   Defendant CITY placed African-American voters into CD 10 based predominantly on the unconstitutional racial stereotype that African-American voters, solely because of their race, will vote as a racial bloc for an African-American incumbent;

e.   Defendant CITY redrew CD 9 based predominantly on the unconstitutional racial stereotype that Latino voters, solely because of their race, will vote as a racial bloc for a Latino candidate;

f.   The boundaries of CD 10 can only be explained based on the use of racial criteria, as evidenced by the irregular shape of the District, which ignores traditional redistricting principles including contiguity and compactness, keeping communities of interest intact, following the requests of these communities' residents, avoiding overpopulation or underpopulation of Districts, and CD 10's own history as a cross-racial coalition District;

g.   The boundaries of CD 9 can only be explained based on the use of racial criteria, as evidenced by the CITY'S refusal to draw those boundaries in accordance with traditional redistricting principles, including contiguity and compactness, keeping communities of interest intact, following the requests of these communities' residents, and CD 9's own history as a cross-racial coalition District; and

h.   In other ways as will be proven during the trial of this matter.

23

88.     Defendant CITY ignored and/or rejected several alternative maps proposed by NCI, the Redistricting Collaborative, UCA, APALC, KAC, and Dr. Wiseman that would have better satisfied the legitimate political goals of the Redistricting Commission as well as traditional nonracial redistricting principles, including keeping neighborhoods and communities of interest intact and following the requests of the residents of those neighborhoods and communities. Instead, Defendant CITY considered and adopted a map that drew District lines predominantly on the basis of race, thereby ignoring or subordinating traditional, nonracial redistricting principles and legitimate political goals.

89.     Defendant CITY'S use of race in drawing CD 10 is not strictly necessary to serve a compelling governmental purpose.

90.     Defendant CITY'S use of race in drawing CD 9 is not strictly necessary to serve a compelling governmental purpose.

91.     Defendant CITY has offered no adequate justification for discriminating on the basis of race for the purpose of drawing CD 10.

92.     Defendant CITY has offered no adequate justification for discriminating on the basis of race for the purpose of drawing CD 9.

93.     Defendant CITY'S use of race is not the least restrictive means available to give the residents of CDs 8 and 9 an opportunity to participate equally in the political process.

94.     Plaintiffs and all other voters who own businesses or reside in CD 8 or CD 9 were denied equal protection under the law and injured by the CITY, and its agents, when the CITY used race-based discrimination to draw CD 9 and CD 10 without a compelling governmental purpose or where less restrictive means were available.

95.     For all of these reasons, the Redistricting Ordinance violates the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

96.     Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the Redistricting Ordinance will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

97.     To remedy these Equal Protection violations in a timely manner, this Court should

1  appoint a Special Master to oversee the process of redrawing district lines pursuant to fair and

2  legal criteria.

3      98.    In the interests of justice, this Court should order the Special Master to implement

4  redistricting criteria, including population equality and preservation of communities and

5  neighborhoods of interest, including the Neighborhood Council boundaries.

6      99.    Upon presentation of an appropriate independent redistricting plan by the Special

7  Master, this Court should adopt that plan and order elections to proceed in 2013 using those

8  Districts.

9                          **FOR THE SECOND CAUSE OF ACTION**

10                  **(Violation of Section 204 of the Los Angeles City Charter)**

11

12     100.    Paragraphs 1 through 84, inclusive, and paragraphs 86 through 99, inclusive, of

13  this Complaint are re-averred and incorporated herein by reference.

14     101.    Section 204 of the City Charter mandates that "All [City Council] districts **shall**

15  be drawn in conformance with requirements of state and federal law and, to the extent feasible,

16  **shall** keep neighborhoods and communities intact, utilize natural boundaries or street lines, and

17  be geographically compact.

18     102.    As demonstrated in numerous alternative maps submitted to the Redistricting

19  Commission, it was and is feasible to equalize the population in CD 14 while keeping the 2001

20  boundaries of CD 9 mostly intact, in accordance with the requests of residents and stakeholders

21  of CD9, or to equalize the population in CD 14 through a more equitable division of the

22  Downtown community between CD 9 and 14 that does not include artificially splitting the Los

23  Angeles Convention Center, Staples Center, and L.A. Live landmarks and adjacent properties

24  from the rest of the Downtown community.

25     103.    Furthermore, as demonstrated in maps submitted by UCA and Dr. Wiseman, it

26  was and is feasible to equalize the population in CD 10 while keeping the historically African-

27  American neighborhoods of Baldwin Hills/Crenshaw and Leimert Park in CD 8.

28     104.    Additionally, as demonstrated in maps submitted by Commissioner Helen Kim,

APALC, and KAC, among others, it was and is feasible to keep the WCKNC Boundaries whole within a single District.

105.   In failing to do all of the following, the CITY, in enacting the Redistricting Ordinance, failed to keep neighborhoods and communities intact even though it was feasible to do so:

a.   Keep the 2001 boundaries of CD 9 largely intact, or achieve a more equitable division of the Downtown community between CD 9 and CD 14 that did not artificially split apart the Downtown community and the Los Angeles Convention Center, Staples Center, and L.A. Live landmarks and their adjacent properties;

b.   Keep certain key and historically African-American neighborhoods, including Baldwin Hills/Crenshaw and Leimert Park, whole in CD 8; and

c.   Keep the WCKNC Boundaries whole within a single District.

106.   Furthermore, the Redistricting Ordinance violates the United States Constitution, and therefore violates the City Charter's requirement that Districts be drawn in conformance with the requirements of federal law.

107.   Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the Redistricting Ordinance will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

## FOR THE THIRD CAUSE OF ACTION

### (Violation of California Constitution Article II, Section 11(a))

108.   Paragraphs 1 through 84, inclusive, paragraphs 86 through 99, inclusive, and paragraphs 101 through 107, inclusive, of this Complaint are re-averred and incorporated herein

1   by reference.

2       109.    Los Angeles City Charter Section 460 provides that "[a]ny ordinance adopted by the

3   Council, except an ordinance taking effect upon its publication or passage as provided in

4   Section 252, is subject to a referendary petition as set forth in this Article."

5       110.    Los Angeles City Charter Section 252 lists ordinances "which shall take effect

6   upon their publication: . . . (h) an ordinance establishing Council or Board of Education districts .

7   . . ." Through its City Charter, Defendant CITY has prohibited Plaintiffs from exercising their

8   right to a referendum.

9       111.    Article II, Section 11(a) of the California Constitution states that initiatives and

10   referendum powers may be exercised by the electors of each city or county under procedures that

11   the Legislature shall provide.

12       112.    Each of the Plaintiffs is prepared and willing to file a petition for referendum to

13   overturn the Redistricting Ordinance. By prohibiting Plaintiffs from pursuing such a referendum,

14   the City Charter violates the California Constitution.

15       113.    Plaintiffs have no adequate remedy at law other than the judicial relief sought

16   here. The failure to temporarily and permanently enjoin enforcement of the Redistricting

17   Ordinance will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

18   **PRAYER FOR RELIEF**

19   **WHEREFORE,** Plaintiffs pray for judgment and relief as follows:

20       1.    That the Court temporarily enjoin Defendant CITY from calling, holding,

21   supervising, or certifying any elections under the Redistricting Ordinance;

22       2.    That the Court issue a declaratory judgment that the Redistricting Ordinance is

23   unconstitutional and illegal for one or more of the reasons set forth above;

24       3.    That the Court permanently enjoin Defendant CITY from calling, holding,

25   supervising, or certifying any elections under the Redistricting Ordinance;

26       4.    That the Court appoint a Special Master to oversee the redrawing of the District

27   boundaries, taking into account population equality and preservation of communities and

28   neighborhoods of interest, including the Neighborhood Council boundaries;

5.  That, upon the Special Master's completion of a proposal to redraw the District boundaries, the Court issue an order of judgment adopting the Special Master's proposal;

6.  That the Court issue a declaratory judgment that those portions of Sections 460 and 252 of the Los Angeles City Charter that prohibit Plaintiffs from petitioning for and carrying out a referendum to overturn the redistricting ordinance are unconstitutional;

7.  That the Court order Defendant CITY to hold a referendum on the Redistricting Ordinance;

8.  That the Court award Plaintiff compensatory damages according to proof;

9.  That the Court award Plaintiffs the costs of this action together with their reasonable attorneys' fees, pursuant to 42 U.S.C. section 1988; and

10.  That the Court award Plaintiffs all other damages and relief, equitable or otherwise, including, but not limited to attorneys' fees, as the Court may deem just and proper.

DATED: February _2̲6̲_, 2013                    Respectfully submitted,

                                                LAW OFFICES OF LEO TERRELL


                                                By: _____

                                                Leo James Terrell, Attorney or Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all causes of action that are triable by jury.

DATED: February 26, 2013

Respectfully submitted,

LAW OFFICES OF LEO TERRELL

By: _____

Leo James Terrell, Attorney or Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Stephen V. Wilson and the assigned discovery Magistrate Judge is Paul Abrams.

The case number on all documents filed with the Court should read as follows:

## CV13- 1410 SVW (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

---

Name & Address:
Law Offices of Leo James Terrell
Leo James Terrell (SBN 149693)
8383 Wilhsire Blvd., Suite 652
Beverly Hills, CA 90211

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

STANLEY HAVERILAND, THEODORE THOMAS,
HORACE PENNMAN, JULIA SIMMONS,
HEATHER PRESHA, SALLY STEIN, individuals,

PLAINTIFF(S)

v.

CITY OF LOS ANGELES, a municipal organization,
and DOES 1 through 10, inclusive,

DEFENDANT(S).

CASE NUMBER

CV13-01410-SVW(PLAx)

SUMMONS

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Leo James Terrell, Esq._____, whose address is _Law Offices of Leo James Terrell, 8383 Wilshire Blvd. Suite 652, Beverly Hills, CA90211_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___FEB 2 6 2013___

By: ___ANDRES PEDRO___
Deputy Clerk

(Seal of the Court)

1202

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

STANLEY HAVERILAND, THEODORE THOMAS, HORACE PENNMAN, JULIA SIMMONS, HEATHER PRESHA, SALLY STEIN, Individuals

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

CITY OF LOS ANGELES, a municipal organization, and DOES 1 through 10, Inclusive,

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Law Offices of Leo James Terrell
Leo James Terrell
8383 Wilshire Blvd. Suite 652
Beverly Hill, CA 90211

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** unspecified

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
1) 42 USC 1983; 2) Section 204 of the Los Angeles City Charter; and 3) Article II, Section 11(a) of the California Constitution

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☒ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY: Case Number: **CV13-01410**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☐ NO   ☒ YES

If yes, list case number(s):   Lee, et. al. v. City of Los Angeles, CV 12- 6618 CBM (JCGx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
NOTE: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**   **DATE:** February 25, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |